[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This action originated on October 3, 1990, with the filing of, a petition in the Court of Probate, District of Guilford, by Nancy S.L. seeking termination of the parental rights of Jerome S., in their son, Jeremy J. S.
The petitioner alleged that Jeremy had been abandoned by Jerome S. for not less than one year, one of the non-consensual grounds set forth in subsection (f) of 45a-717 of the Conn. Gen. Stats.
That court then ordered a termination study by the Commissioner of the Department of Children and Youth Services, under Conn. Gen. Stat. 45a-717(e), and ordered notice to Jerome S. by publication in the West Side Times on October 16, 1990. On June 13, 1991, Probate Judge Shirley M. Sabine transferred the case under Conn. Gen. Stat. 45a-715(g) to this court. On September 6, 1991, the petitioner filed a motion to amend the complaint alleging as an additional ground for termination of parental rights, as provided in Conn. Gen. Stat. 45a-717(f), that there is, for not less than one year, no ongoing parent-child relationship, which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child, and to allow further time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interests of the child.
On October 25, 1991, the court granted, without objection from the respondent, the petitioner's motion to amend. The trial began that day and was continued until November 26, 1991, to allow the respondent to produce additional evidence. On November 26, 1991, the parties rested and the court ordered that simultaneous briefs be filed by 5:00 P.M. on December 12, 1991.
I. Termination of Parent Rights Procedure
The termination of parental rights is "a most serious and CT Page 2175 sensitive judicial action." In re Jessica M., 217 Conn. 459, 464
(1991), quoting from Anonymous v. Norton, 168 Conn. 421, 430, cert. denied, 423 U.S. 935, 96 S.Ct. 294, 46 L.Ed.2d 268 (1975). By statutory definition, termination of parental rights means "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption. . . ." Sec. 45a-707(g) Conn. Gen. Stat. "Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children "`undeniably warrants deference and, absent a powerful countervailing interest, protection.'" In re Juvenile Appeal (Anonymous), 177 Conn. 648, 671 (1979). The interest of parents in their children is a fundamental constitutional right. In re Jessica M., supra, at 464. Even when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life. In re Jessica M., supra at 465, quoting from Santosky v. Kramer,455 U.S. 745, 573, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982).
Before proceeding to the merits of the petitioner's allegations, it is advisable to mention the procedure that is to be followed in matters of this type. A petition to terminate parental rights consists of two phases, adjudicatory and dispositive. Practice Book 1049, 1042, 1044. Although evidence relating to both phases may be presented together, as was done in this case, In re Juvenile Appeal (84-AB), 192 Conn. 254, 259
(1984), the two phases serve different purposes. In the adjudicatory phase the court determines the validity of the grounds in the petition and, hence, is limited to events that precede the filing of the petitions, in this case, on September 6, 1991. In re Juvenile Appeal (Anonymous), 177 Conn. 648, 673
(1979). The dispositive phase is concerned with what action should be taken in the best interest of the child and as to it the court may extend its consideration to events occurring until the end of the trial which in this case was November 26, 1991. In re Juvenile Appeal (84-AB), supra at 267 and n. 14.
To effectuate a non-consensual termination of parental rights a petitioner must prove first, by clear and convincing evidence, the existence of at least one of three statutory grounds for termination set forth in Conn. Gen. Stat. 45a-717(f).
 "Since termination of parental rights is the ultimate interference by the state with the natural rights of parents in their children, resulting in an everlasting severance of the legal relationship, and usually the permanent separation of parent and child as well, courts must require strict adherence to statutory CT Page 2176 standards."
In re Migdalia M., 6 Conn. App. 194, 203 (1986).
As a matter of constitutional as well as statutory law, the finding must rest upon clear and convincing evidence. Santosky v. Kramer, 455 U.S. 745, 769-70, 102 S.Ct. 1388, 71 L.Ed.2d 599
(1982); Conn. Gen. Stat. 17a-112(b); Practice Book 1049.
If a statutory ground for termination is so established, the court must proceed to make the six written findings required by Conn. Gen. Stat. 45a-717(h) before moving on to determine whether termination is in the best interests of the child. At this dispositional stage, petitioner must prove by clear and convincing evidence that the termination sought is in the child's best interests. "Consideration of the best interests of the child cannot vitiate the necessity of compliance with the statutory criteria for termination." In re Jessica M., supra at 465; In re Barbara J., 215 Conn. 31, 45 (1990). Nor can the court consider the availability of an appropriate adoptive home as bearing on the issue of establishing a statutory ground for termination. In re Jessica M., supra at 466.
II. Facts
Evidence offered in the trial supports the finding of the following facts:
 I.
The child, Jeremy, was born on February 12, 1985. The petitioner, Nancy L., is Jeremy's natural mother and custodial parent. The respondent, Jerome, is the natural father.
Jerome and Nancy lived together in New York off and on in the middle of 1983. She became pregnant in June of 1984 and was living with her mother because her relationship with Jerome had become very violent. (Tr. Oct. 25, 1991; p. 38). He would threaten and harm her and tell her people were watching her for him. He also hit and beat her. He was a drug addict and shot up drugs and stole her money. She then moved into her own apartment in July of 1984 while she was pregnant. The address was on Rother Street in Buffalo, New York. Sometimes Jerome tried to stay with her there but she wouldn't let him in the house. He did, however, sometimes sleep in the hallway. Her sister coached her during childbirth classes. Jerome's mother brought her to the hospital to give birth and Jerome did visit in the hospital after Jeremy was delivered and stayed until early in the morning. Nancy believed he had nowhere else to stay on that winter night. CT Page 2177
A month after Jeremy was born, Jerome was put in jail. (Tr. Oct. 25, 1991; p. 40). She did go visit him in jail because she hoped he would get off the drugs and they could be a family. (Tr. Oct. 25, 1991; p. 41). While in jail, Jerome never sent anything to her or the baby. He called her while he was in jail but didn't really discuss the baby's welfare. She brought the baby with her once a week until the baby was about six months. She stopped bringing the baby at six months because he had started to crawl and the guards only wanted her to have the baby on her lap. (Tr. Oct. 25, 1991 p. 78). During each visit Jerome did ask Nancy to smuggle drugs into jail for him. This she did not do.
Jerome was released from jail when Jeremy was thirteen months old. On the day he got out of jail he went out and shot himself up. Jerome moved back in with Nancy and Jeremy for approximately two weeks, but then the relationship again became rocky. When Jeremy was thirteen months old, he saw his father the most of his whole life, for approximately a month. This time she felt threatened because she was approached by a man with a gun who was sitting in front of her home in a van. This man said that Jerome took $950 from him for drugs and he was supposed to bring it back and he never showed up. This man sat in front of her house all night long. (Tr. Oct. 25, 1991; p. 42). After that incident she told Jerome she didn't want him coming around anymore. He stated that part of their understanding was that he not come around to see his son and he did comply with this.
On March 4, 1986, a paternity determination was made by the Family Court of the State of New York that Jerome was the father of Jeremy and that custody is in mother — Nancy M. — and that the father has reasonable rights of visitation. (Petitioner's Ex. C). A few days later, in March of 1986, Jerome came to her house and hit Nancy's head against Jeremy's head while she was holding Jeremy. She then sought an order of protection on March 11, 1986, from the Family Court in the State of New York. (Petitioner's Ex. B). The restraining order required that Jerome stay away from Nancy M. and her residence but it allowed him to visit the child at reasonable times by first telephoning the petitioner to make arrangements. She last saw Jerome in 1986. He called her after that time in 1986 but only to harass her and did not inquire about Jeremy. He did not mail or drop off anything for his son. She had no contact from him in 1987 or 1988. When Jeremy was two, she moved to 77 Moore Street, in Buffalo, right down the street from her former address.
Up until 1987, Jerome's parents initiated contact with Nancy and Jeremy but after that there was no contact.
She was petitioned by Jerome to come to court in 1989 because he wanted visitation rights. (Petitioner's Ex. D). After release CT Page 2178 from prison, her called her once in 1989 about seeing his son. This was the only time he ever inquired about visiting Jeremy. When he did, she indicated that she wanted supervised visitation and that he go to court to get that permission. However, on the first and second appearance dates Jerome did not appear and the court dismissed the petition on July 5, 1989, because Jerome failed to appear in court on May 14, 1989. Jerome never paid any child support. Jerome has a 13 year old son from another relationship.
In 1988, Nancy met John L. and they started living together in December of 1988, when Jeremy was three. They were married on September 29, 1990, in Buffalo, New York. They moved from the general area in Buffalo to Connecticut in October of 1990 for John's job. (Tr. Oct. 25, 1991; p. 55). They have had one child together, a one and a half year old son.
Jerome has been arrested sixteen times and convicted seven times — six misdemeanors and one felony. Jerome was incarcerated in March of 1985 for possession of a forged instrument and served until February 28, 1986 for that charge and other charges. He was then arrested on June 18 of 1986 for possession of stolen property and convicted May 15, 1987 on that charge. In June of 1986, he got out on bail. In July of 1986, a petty larceny case went to trial and he was acquitted. On August 13, 1986, he was arrested and in jail without bail until a week before Easter of 1987 for the charges related to the shooting incident on Mozel Street. Those charges were dropped and then he made a new bail set on the possession of stolen property charge before Easter of 1987. Then on May 15, 1987, he was convicted of the possession of stolen property charge and turned himself in. It is Jerome's belief that May 15 was one day after Easter. In July of 1987, he was sentenced on that charge to a two to four year sentence, served until April of 1989, and then was released on parole until August, 1990. On May 29, 1989 he was arrested on robbery charges and held on bail in jail until August 22 of 1990. He left New York in August until his appeal of the possession of stolen property charge was going to be heard. He then turned himself back in on March 1, 1991. On March 8, he won his appeal. From August of 1990 to March of 1991, he was not incarcerated. There were six months that he could have attempted to make personal contact with his son, Jeremy. From March 1991 through September 14, 1991, he was also incarcerated and his robbery and related charges went to trial in August of 1991, and he was acquitted and released. He started working October 1, 1991, as a laborer for a construction business.
DCYS Termination Study
Ms. Kathryn Bennett, a social worker in the Department of CT Page 2179 Children and Youth Services, conducted the termination study for the court. (See Petitioner's Ex. A). She ultimately recommended that the termination go forward because she opined that there appeared to be no ongoing relationship between the respondent and the child and that the respondent had not maintained a reasonable degree of interest in Jeremy. (Tr. Oct. 25, 1991; p. 11). She also opined that she did not believe it would be helpful to the child to allow more time for the establishment of a parent-child relationship between Jerome and Jeremy. (Tr. Oct. 25, 1991; p. 11).
III. Adjudication
Grounds for termination of parental rights must be based on clear and convincing proof of facts supporting the statutory criteria as they existed at the time the petition was last amended — here, September 6, 1991. The motion to amend the petition was granted on October 25, 1991. The petitioner has pleaded two non-consensual grounds found in Conn. Gen. Stat. 45a-717(f). The petitioner must prove at least one of these grounds by clear and convincing evidence; which must have existed for at least one year, unless waived under Conn. Gen. Stat. 45a-717(g).
 "Clear and convincing evidence, the required standard of proof in termination actions, has been described in both quantitative and qualitative terms. For example, clear and convincing evidence has been defined as a level of persuasion lying between the usual civil requirement of proof by a fair preponderance of the evidence and the requirement in criminal cases of proof beyond a reasonable doubt. Cookson v. Cookson, 201 Conn. 229, 234, 514 A.2d 323 (1986). Another and more qualitative definition is that clear and convincing evidence is proof sufficient to satisfy a court beyond an average certainty. In re Juvenile Appeal (84-3), 1 Conn. App. 463, 468, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984)."
In re Shannon S., 41 Conn. Sup. 145, 150 (1989).
A. Abandonment
Conn. Gen. Stat. 45a-717(f)(1) defines "abandonment" as the parents' failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child."
 "Where a parent fails to visit a child, fails to display any love or affection for the child, has CT Page 2180 no personal interaction with the child and no concern for the child's welfare, statutory abandonment has occurred."
In re Rayna N., 13 Conn. App. 23, 36 (1987).
The Supreme Court decision in In re Juvenile Appeal, (Docket No. 9489), 183 Conn. 11 (1981), sustained a termination on this ground of statutory abandonment and discussed five minimum attributes of parenthood: (1) express love and affection for the child; (2) express personal concern as to the health, education and general well being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. The finding of abandonment focuses on the parent's conduct. In re Juvenile Appeal, supra at 14.
The extent to which a specific parent should be held to the performance of all or some of the above-stated obligations depends on the particulars of a given case and the focus is on the parent's conduct.
Consideration must be given to the status of Jerome as a non-custodial parent. From Jeremy's birth to the present, his sole effort to "make" some contact with Jeremy was limited to one telephone call to Nancy L. in 1989 after one of his releases from prison. At that time, Jeremy was four years old. Jerome's contact, which, at best, can be described as a momentary display of interest, fell far beneath the statutory standard, which requires that a parent "maintain" a reasonable degree of interest in the welfare of his child.
The incarceration of a parent does not alone constitute abandonment. In re Juvenile Appeal, (Docket No. 10155), 187 Conn. 431,443 (1982). Additionally, incarceration of a parent alone also does not constitute cause for termination of that parent's rights. See In re Juvenile Appeal (Docket No. 10155), 187 Conn. 431
(1982). An incarcerated father will be judged by the standard of what is reasonable for one in his circumstances. This case is distinguishable from In re Rebecca W., April 23, 1985, Judge Brenneman. In that case the incarcerated father made repeated requests to the mother to bring the child to the jail; he wrote to the mother requesting that she bring the child; he telephoned the child on her birthday, sent birthday cards, and a Christmas card. Even though Jerome was incarcerated during much of Jeremy's life that does not excuse a failure to make use of available, although limited, resources for communication with one's child. See In re Juvenile Appeal (Docket No. 10155), 187 Conn. 431, 443 (1982).
The facts established show that Nancy brought the child to CT Page 2181 visit Jerome at the prison until the child was about six months old. Upon greeting the child, he hugged and kissed him but there was no evidence that he discussed and expressed concern about the welfare of the child. The focus of most of those discussions was on attempts to convince Nancy to smuggle in drugs to him while he was incarcerated. Here again, Jerome did not write or call or send anything to Jeremy when he was incarcerated. Additionally, there were some lengthier periods when he was not incarcerated (from August 1990 to March 1991) where there is no evidence of any attempts to make contact with Jeremy and which reveal a pattern of unconcern for Jeremy's welfare.
Jerome then argues that the petitioner should have informed Jerome or his parents of Jeremy's whereabouts. The evidence reveals that Jerome's parents had contact with Jeremy up until 1987. Additionally, Jerome called the petitioner in 1986, but did not inquire about Jeremy and made no calls in 1987 or 1988. He then called her in 1989 about seeing Jeremy. She moved to Connecticut in October of 1990. Therefore, from Jeremy's birth in 1985 to 1989, Jerome reached the petitioner when he so desired. It can not now be persuasively argued that she deliberately or unreasonably prevented him from communicating with his child. The record does not reveal any specific attempts by Jerome to contact or communicate with his Son, except for the one incident in 1989, that were aborted by the petitioner. Again, with respect to Jerome's one call in 1989, the petitioner told him to take her to court because she wanted supervised visitation since Jerome was a stranger to Jeremy. She acknowledged that Jerome had rights of reasonable visitation of Jeremy under the court order of protection that was issued in March of 1986 to protect the petitioner from abuse by Jerome; but because he had not attempted such visitation from 1986 until 1989, she now was concerned that supervised visitation was necessary since Jerome was such a stranger to Jeremy.
The father additionally argues that for the father to feel that the son's mother is better able to care for his son in light of the fact that he was incarcerated is not an indication of abandonment. He cites the case of In re Migdalia M., 6 Conn. App. 194,210 (1986) to support his argument. That case involved a child who had severe developmental disabilities and was seriously ill and was placed in foster care to manage all his medical needs. The court reasoned that the wealthy parent who cannot give daily arduous care to a severely physically handicapped child obtains the care necessary by paying for it, and does not have his parental rights terminated because of an inability to learn how to care full time for the dependent child. Therefore, a low income parent who cannot cope with the daily care should be put in no different position as far as concerns the termination of parental rights. However, the court further reasoned that if the parents CT Page 2182 of such a child have parenting limitations but love their child, consistently express an interest in the child's welfare and periodically visit with the child committed to foster care, parental rights should not be terminated unless the effect on the child is detrimental. The court also noted that the mother's belief that the foster parents are better able to care for her daughter is not necessarily an indication that she has abandoned her child but may be an indication that she places her daughter's health above her own desire to be with her daughter. The transcript revealed that she visits the child, has personal interaction with her, displays love and affection, and expresses a concern for her welfare. Again, that case is clearly distinguishable from the present case. There was no evidence in this case that Jeremy had any special medical or developmental needs that the petitioner could meet and that the father could not meet. Further, if the father is equating "inability to give exceptional care required by this child's medical condition" to his "inability to give any care due to his incarceration", this court, as has been stated previously, has no quarrel with the status of the law that incarceration alone does not constitute abandonment. However, the conduct of the incarcerated father in this case reveals a pattern of unconcern for Jeremy's welfare, shows a failure by the father to maintain a reasonable degree of interest in the welfare of his child, and is markedly different from the conduct of the parents in In re Migdalia M., supra, who could not personally meet the exceptional care needs of their daughter.
Based on all the above, the court therefore finds that abandonment of Jeremy by Jerome for not less than one year has been established both clearly and convincingly.
B. No Ongoing Parent Child Relationship
Conn. Gen. Stat. 45a-717(f)(3) defines this ground for termination as the absence of an ongoing parent-child relationship as "the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or re-establishment of the parent-child relationship would be detrimental to the best interest of the child."
To establish this ground for termination requires the trial court to make a two-pronged determination. "First, there must be a determination that no parent-child relationship exists; and second, the court must look to the future and determine whether it would be detrimental to the child's best interests to allow time for such a relationship to develop." In re Juvenile Appeal (Anonymous), 177 Conn. 648, 670 (1979). CT Page 2183
Judicial interpretation has imposed on this statute requirements that a child have "present memories or feelings" for the parent, and ". . . . at least some aspects of these memories and feelings are positive" to overcome this ground. In re Jessica M.,217 Conn. 459, 475 (1991). The origin of the requirement that the child have "present memories or feelings" for the parent in order for this ground to exist is found in In re Juvenile Appeal (Anonymous), 177 Conn. 648 (1979).
In that case, the Supreme Court states at 670-671:
 "It is reasonable to read the language of `no ongoing parent-child relationship' to contemplate a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship, so that despite its former existence it has now been completely displaced. In either case the ultimate question is whether the child has no present memories or feelings or the natural parent. . . The statute does not authorize the termination of parental rights upon a showing of a troubled relationship, but only upon a showing of no relationship." (emphasis added)
In 1984, the Appellate Court cited with approval the above 1979 case and rejected arguments that "negative" feelings by the child about the parent were sufficient to overcome a claim of no ongoing parent-child relationship. The court concluded "that the phrase "feelings for the natural parent" refers to feelings of a positive nature." In re Juvenile Appeal (84-6), 2 Conn. App. 705,709, cert. denied 195 Conn. 801 (1984). Therefore, in determining whether there is an ongoing parent-child relationship, the court should consider the feelings of the child toward the parent, especially if those feelings are positive rather than negative.
In addition, the mere fact that there has been some minimal contact between the parent and the child does not preclude a determination that there has been no ongoing parent-child relationship for a period in excess of one year. In re Juvenile Appeal (Anonymous), 181 Conn. 638, 646 (1980).
There is really no dispute that there exists between the respondent and his son at present no relationship of any kind, much less an "ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child." The CT Page 2184 respondent saw the child after birth. The petitioner brought the baby once a week to see the respondent while he was in jail. She brought the baby on the visits until he was about six months old. When Jeremy was thirteen months old, he saw his father the most of his whole life, for approximately a month.
Kathryn Bennett, the social worker from DCYS who conducted the mandated termination study, testified that by talking to the child, who was 6 1/2 years of age, that there appeared to be no ongoing relationship between the child and the father. The child told her that he was aware that he had a first father but that "this was a stranger to him and someone who, probably, because of his age, was someone that whom he had virtually no interest." (Tr. Oct. 25, 1991; p. 12). She also testified that the child has no present memory of the father and could not relate or recall anything about his natural father. (Tr. Oct. 25, 1991; p. 24).
Additionally, the respondent conceded that there was never a period in his child's life that he — the father — developed an ongoing parent-child relationship. (Tr. Oct. 25, 1991; p. 122).
Therefore, based on these findings of facts, together with the facts for the abandonment ground, the petitioner has proven by clear and convincing evidence that there is no ongoing parent-child relationship between Jerome and Jeremy and that this situation has lasted no less than one year. That having been established, the court must determine whether allowing further time for the establishment of an ongoing parent-child relationship would be detrimental to the child's best interest.
Ms. Bennett also testified that she believed that beginning a relationship with the father at six or almost seven years of age would be somewhat threatening. (Tr. Oct. 25, 1991; p. 25). She testified that it could make him feel insecure, preoccupied and unable to control his own life. (Tr. Oct. 25, 1991; p. 26). She also testified that it would cause chaos and be anxiety-producing to Jeremy. (Tr. Oct. 25, 1991; p. 26). She also testified that most children become very angry and unhappy when they're forced into relationships that they don't choose and are not necessarily satisfying, and, certainly ones that would remove him or impose themselves on what otherwise is a very warm and satisfying home situation to him. (Tr. Oct. 25, 1991; p. 27). She also testified that Jeremy appeared to have bonded very warmly and positively to his stepfather and that on Jeremy's emotional level that is the only father he knows or has any interest in. (Tr. Oct. 25, 1991; p. 12). She then concluded that it wouldn't be helpful to the child for more time to be given to establish that parent-child relationship between his father and him. (Tr. Oct. 25, 1991; p. 11). When asked if he had a plan or any idea of how to develop a relationship or an interest in his son, should parental rights not CT Page 2185 be terminated, Jerome stated that he had no plan or ideas at this time. (Tr. Oct. 25, 1991; pp. 122-123). He stated, however, that when Jeremy was old enough that he and his wife could talk it over with the petitioner and her husband before "bringing Jeremy into the picture." (Tr. Oct. 25, 1991; p. 123). He did not indicate when Jeremy would be "old enough". The record is devoid of any evidence to suggest any possible benefit to this child from being introduced to a "real" father whom he does not know and for whom the prognosis for lasting rehabilitation from a life of drug abuse, crime and violence, is quite questionable.
The father argues that the testimony of the DCYS social worker on this issue was insufficient and he cites In re Juvenile Appeal (84-3), 1 Conn. 463, 480 (1980), to support his position. In that case there was evidence as to the relationship with the foster parents and their availability and suitability as foster parents, which was relevant to the issue of the child's best interest, but that evidence, in and of itself, was insufficient to find that it would be detrimental to the child's best interests to allow the natural parent-child relationship to develop.
That case is clearly distinguishable from the present case. There was evidence, as noted above, offered in this case by the DCYS social worker that went beyond the suitability of John L. as an adoptive parent and supports this court's own factual determination that it would be detrimental to the child's best interests to allow more time for the natural parent-child relationship to develop. See also In re Teshea D., 9 Conn. App. 490,493 (1987). (In that case, the court noted that although the Supreme Court has often looked to the testimony of mental health experts, such testimony is not a precondition of the court's own factual judgment as to the child's best interest. In that case, the court found sufficient the testimony of the DCYS social worker.)
Therefore, based on these facts existing as of September 6, 1991, the court must and does find, by clear and convincing evidence, that to allow further time to establish a parent-child relationship would be detrimental to the child's interest.
IV. Disposition
While grounds do exist to terminate a respondent's parental rights, termination may not be ordered unless the court finds, also by clear and convincing evidence, that it is in the child's best interest to do so on facts existing at the last date of trial, here, November 26, 1991, after considering the six factors enumerated in Conn. Gen. Stat. 45a-717(h):
(1) No services have been provided to the parent and child by CT Page 2186 any agency to facilitate the reunion of the child with his father in view of the fact that he has been incarcerated most of the child's life and the child has been receiving vigilant care since birth from his custodial mother. Further, there is no evidence that the respondent ever sought any services from any agency for such reunion.
(2) No court orders were entered in this case, except that (A) on March 4, 1986, a paternity determination was made by the Family Court of the State of New York that Jerome was the father and that custody was in mother, Nancy M., and that the father had reasonable rights of visitation; (B) the petitioner sought and received a restraining order a few days after March 4, 1986, to require the respondent to stay away from her and her residence, but it allowed the respondent to visit the child at reasonable times by first telephoning the petitioner to make arrangements; and (C) the respondent petitioned the court in 1989 for supervised visitation but failed to appear for court on the first and second court dates and the petition was dismissed. With respect to the respective obligations, Nancy fulfilled her obligations for Jeremy's custody and Jerome only once indicated an interest to exercise his visitation rights, and at other times he had agreed not to visit his son as it was not in his son's best interest.
(3) The child has no memory of his natural father and has warm and positive feelings to his stepfather. The child has a positive, happy relationship with his mother, who is at home for him and available when he comes home from school and produces a routine in the home he seems to find relaxing and positive.
(4) The child was born on February 12, 1985.
(5) The respondent has made no effort to adjust his circumstances, except for the one attempt at visitation in 1989. During the respondent's incarceration, he was unable to do very much to "adjust his circumstances, conduct or condition to make it in the best interests of the child to return him to his home in the foreseeable future." The inapplicability of this required finding is evident: the child is home and always has been. If this is interpreted to mean efforts made by the respondent to make it possible for Jeremy to know him as a non-custodial parent in the foreseeable future, the conclusion would have to note the one attempt at visitation in 1989. While he sporadically contacted the mother, that contact was not addressed to the welfare of Jeremy but was used primarily to harass and threaten the mother and would clearly not be sufficient to "adjust his circumstances" to make it in Jeremy's best interests to be placed in his home even temporarily.
(6) The petitioner did seek a restraining order to keep the CT Page 2187 respondent from abusing her in 1986 and did agree with the respondent at that time that he should not visit the child after 1986, as it was not in his son's best interest. She further admits that she did not allow him to have visitation, when he called for it that one time in 1989, because she did not believe Jeremy should be exposed to a stranger in an unsupervised visitation. The petitioner's reluctance to visitation at that time was not an unreasonable act or conduct. Clearly the respondent's incarceration placed him in difficult circumstances to maintain a meaningful relationship with the child, but there is no evidence that the limited resources of communication while incarcerated were denied to him.
The adjudicatory phase having been completed, the court is required to determine whether, by clear and convincing evidence, it is in the best interest of Jeremy that Jerome S.'s parental rights be terminated.
Except for the fact that at the conclusion of trial, the respondent was out of jail and employed as a laborer, nothing else has changed with regard to the facts at the amended filing date.
The task of the court, however, is not to select a caretaker for Jeremy. "[A] parent cannot be displaced because `someone else could do a "better job" or raising the child. . . .'" In re Jessica M., supra at 467, quoting from Carey L. v. Martin L., 45 N.Y.2d 383,391, 380 N.E.2d 266, 408 N.Y.S.2d 439 (1978).
In this phase, the court is concerned with what action should be taken in the best interest of the child. The court must determine by clear and convincing evidence that the parental acts or deficiencies found in the adjudicatory phase support the conclusion that this respondent parent cannot have or should not exercise, in the best interest of the child, any further parental rights and duties. In re Juvenile Appeal, 192 Conn. 254 (1984).
The child has thrived in the custody of his mother and has developed a positive and warm relationship with his stepfather. The child has no ties to his natural father. Jerome S. has played no role in Jeremy's life up until this time and there is no reason to believe he would do so in the future.
Having considered the foregoing six (6) factors and based on the evidence presented, the court must and does find, by clear and convincing evidence, that Jeremy's best interest will only be served if the respondent father's parental rights are terminated.
V. Judgment
It is therefore ORDERED that the parental rights of Jerome S. CT Page 2188 in and to the child Jeremy S., be, and hereby are, terminated. Pursuant to Conn. Gen. Stat. 45a-717(i) this leaves the petitioner herein the sole parent and guardian of the person of the child, and as such may pursue a stepparent adoption by her present husband under Conn. Gen. Stat. 45a-724(2)(D).
VI. Appeal
Trial counsel for father is appointed appellate counsel, should father seek to take an appeal of this judgment. Should counsel decline to perfect such appeal because in his professional judgment it lacks merit, counsel is to notify the court promptly so as to allow the court to appoint a second attorney to review the record. Should such second attorney be appointed and decline to perfect an appeal, that attorney is to notify the court promptly, so that the clerk of the court can inform father of his right to secure counsel for an appeal, who, if qualified, may be appointed by the court.
CLARINE NARDI RIDDLE, JUDGE